Robert Y. H. Thomas and Mary B. Thomas v. Commissioner.
Thomas v. Commissioner
Docket Nos. 86343, 90206.
United States Tax Court
T.C. Memo 1962-73; 1962 Tax Ct. Memo LEXIS 235; 21 T.C.M. (CCH) 382; T.C.M. (RIA) 62073; April 2, 1962
*235 William R. Frazier, Esq., 816 Atlantic National Bank Bldg., Jacksonville, Fla., for the petitioners. Fred H. Steffey, Esq., for the respondent. RAUM
Memorandum Opinion RAUM, Judge: The Commissioner determined the following deficiencies in income tax against petitioners. Additions to Tax
Sec. 6654(a),
Year
Income Tax
I.R.C. 1954
1956
$6,903.12
$ 5.28
1957
8,582.02
129.63
1958
4,057.39
16.85 Petitioners, husband and wife, filed their joint income tax returns for the calendar years 1956-1958 with the director of internal revenue at Jacksonville, Florida. Various concessions have been made by the parties, and there remains for adjudication a single dispositive issue, namely, whether losses sustained during each of the years in the operation of a farm at which petitioners resided are deductible as having been incurred in the conduct of a bona fide trade or business. A stipulation of facts has been filed by the parties. Robert Y. H. Thomas, the husband, will sometimes hereinafter be referred to as the petitioner. The evidence shows that petitioner, a physician, received his medical degree in 1935. His office is, and for a number *236 of years, including the years in controversy, has been in Jacksonville. He entered the Navy during World War II, and after two years of service was discharged in 1944. He was then single, but was subsequently married in 1946. His practice of medicine has been successful, his income tax returns disclosing gross fees from his profession in the amounts of $82,611.58, $98,927.64, and $72,926.91, for the years 1956, 1957, and 1958, respectively. The evidence further shows that petitioner has long been fond of horses. He was "associated with horses" from childhood, and as he grew up to manhood he became more interested in them and "bought several show horses to show for pleasure." Before World War II he had bought some property in Jacksonville which had a stable for show horses. He kept his own horses there and rented the remaining stalls to others. He was then single and lived on the property. At the time petitioner entered the Navy he owned three horses, and had them boarded while he was in the service. After his discharge, he again took possession of these horses and kept them in Orange Park, near Jacksonville, where he had approximately 20 acres of land. He built and remodeled barns *237 and built a training ring for his horses on the property. His house was also on the property, and he testified that "I lived there and used these horses for my pleasure." He would buy and sell horses from time to time, and he kept, trained and rode horses, for pleasure, at his Orange Park property. He would "show" his horses for many years at various horse shows and obviously took great pride in a handsome or well-trained animal. He and his wife resided at the Orange Park property from the time of their marriage in 1946 until 1957, when he purchased a farm of some 75 acres at Doctors Inlet, an area about seven miles from Orange Park and about 20 miles from Jacksonville. Petitioner moved to the new farm in December 1957 and still resides there; it is sometimes referred to as Ipswich Farm. He has commuted daily for many years from his residence (first at Orange Park and later at Doctors Inlet) to his office in Jacksonville. Petitioner's house at Doctors Inlet is along the waterfront, and his property has a frontage of 1,750 feet along the waterfront. The landscaped area around the house is about 150 by 175 or 200 feet. There is an orange grove and a pecan grove on the farm, of about *238 4 acres, and 15 acres, respectively. Some of the land consists of swamps and forest, and the remaining area (some 30 acres) consists of fields that are cultivated so as to be suitable for grazing or otherwise developed for the horses. Both at the Orange Grove property and at Doctors Inlet, petitioner had barns, outbuildings, and a variety of equipment suitable for maintaining the property as well as his horses. During the years 1956-1958, petitioner claimed deductions in the amounts of $14,297.97, $14,501.20, and $13,091.89, as net losses from the operation of his farm. For those years he had reported gross income from his farm as follows: 1956
($370.00) [1]
1957
None
1958
$980.59
These amounts were taken into account in determining the net losses. The Government takes the position that petitioner's farming operations did not constitute a trade or business carried on for *239 profit, and that the losses incurred, being personal in nature, are not deductible. Petitioner admits that for the period of years until the end of 1954 his activities with respect to horses were purely for his pleasure and did not constitute the conduct of a trade or business. However, it is his contention that beginning with January 1, 1955, his activities in relation to horses underwent a sharp and drastic change, that commencing with 1955 he went into the business of breeding horses, that he acquired brood mares for that purpose, that he expanded his facilities in order to engage in breeding horses, and that it was his intention to build up a business that would ultimately yield substantial profits to him. We heard extensive oral testimony attempting to buttress that position, and although we are satisfied that petitioner did engage in some breeding activities after 1954, they were neither of such magnitude or scope, nor were his entire activities relating to horses sufficiently different from his prior activities to convince us that petitioner ever had any bona fide intention of making any profit from the alleged business venture. To be deductible the expenses or losses must *240 be incurred in a bona fide business carried on with the expectation of making a profit. The deduction is not allowable where the activities are primarily in the nature of a hobby or engaged in for the personal gratification of the taxpayer. And the mere remote possibility that a gain might be realized at some distant time is hardly persuasive evidence that the taxpayer had a bona fide intention to conduct a business for profit. As was said in : "It would be specious to say that a vain hope that on some remote day a profit may result is enough to give the operation of the farm the character of trade or business." Cf. , affirmed, (C.A. 6), certiorari denied, . To be sure, many a venture may sustain losses in the formative years, where there is a genuine purpose to build up a business which in the future is expected to yield net income that will more than offset early losses. But there must be a reasonable expectation of such future gains. Extravagant hopes for future profits articulated in an effort to support the claimed deductions are not persuasive *241 evidence of any such reasonable expectation. We did not find convincing petitioner's testimony that he intended to operate a business for profit. Of course, we realize that the early years of a business such as petitioner contended he was engaged in may well show losses. Indeed, we may accept as true the testimony that it takes from five to seven years to develop a breeding farm before it can be expected to show a profit. The difficulty here is that we do not have any convincing evidence that this farm was headed for any profitable operation in any such period. Not only were the losses wholly disproportionate to the receipts during the first four years of operation (ending with 1958), but even the comparatively small receipts themselves do not appear, on the evidence, to be attributable to breeding operations conducted during this four-year period. This case was tried in October 1961, when nearly three more years had elapsed; yet, no evidence was presented as to any significant increase in receipts during these later years. The burden of proof was, of course, upon petitioner, and we cannot indulge in any assumptions in his favor where the record is silent. Petitioner's testimony *242 was often vague and contradictory. We do not feel it necessary to recount all the evidence, indicating those items of evidence that we deem to be inconsistent with or to cast doubt upon petitioner's conclusory assertions that he intended to operate a business for profit. We have concluded, after listening to the witnesses, observing them, and considering the testimony in the light of the record as a whole that petitioner was not operating his farm as a business for profit during the tax years. The picture that unfolds to us is that of a physician with a successful metropolitan medical practice who had developed a pattern of rural living with a strong personal interest in horses over a long period of years, and who had added some horse breeding activities in 1955 to his various other activities involving horses. The aggregate of all these activities, however, was not of such character as would justify us in concluding on this record that petitioner had a bona fide intention during the tax years of engaging in a business for profit. We find as a fact that the losses in issue were personal and were not incurred by petitioner in the conduct of a trade or business. Our attention has been *243 called to a proceeding involving petitioners' income tax liability for the year 1955 in which a jury appears to have made a finding for that year different from the one that we make herein for the years 1956-1958. Robert Y. H. Thomas and Mary B. Thomas v. United States (S.D.Fla.), January 23, 1962, reported in 1962 C.C.H., [*$ 9274. The trial in that case was held after the trial in the present case. We did not hear the witnesses in that case nor do we know what other evidence was there presented. We are satisfied on the evidence presented to us in this case that petitioner did not operate his farm as a business for profit during the years here in issue. The jury verdict upon a different record and involving a different tax year, while entitled to consideration, is not conclusive here. Cf. (Ct. Cls.), certiorari denied, ; , affirmed, (C.A. 2); (C.A. 2); (C.A. 7); . *244 Decision will be entered under Rule 50. Footnotes
1. This figure represents, first, a $500 loss upon a sale of a mare at $350 which had a cost or other basis of $850; and, second, an item of "other farm income" in the amount of $130, which consisted of an $80 fee for hauling horses and a $50 credit from a harness company for saddles.↩